**Opinion filed March 18, 2021**



In The

# Eleventh Court of Appeals

_____

## No. 11-18-00316-CV

_____

## BRENDA JURGENS, Appellant

## V.

## GARY MARTIN, Appellee

**On Appeal from the County Court at Law No. 2**
**Midland County, Texas**
**Trial Court Cause No. CC17920**

## O P I N I O N

This appeal arises from an ancillary civil action related to a probate proceeding. The related probate matter was the Estate of Alice Jean Martin, deceased.[1] The parties to this appeal are two of her children.

---

[1]Throughout this opinion, we will refer to Alice Jean Martin as "Alice" and to her husband, Billy Martin, as "Billy."

Gary Martin filed the underlying suit against his sister, Brenda Jurgens.[2] Jurgens was the executor of Alice's estate. She was also the executor of Billy's estate, and she had held a power of attorney for both of her parents prior to their deaths. Martin alleged that Jurgens wrongfully took and appropriated money from their parents and their parents' estates. Martin alleged causes of action for breach of fiduciary duties, conversion, fraud, fraud by nondisclosure, and civil theft.

After several hearings concerning Jurgens's compliance with discovery orders, the trial court imposed death penalty sanctions against her and subsequently entered a default judgment against her solely as to liability. The trial court later entered a final judgment against Jurgens and in favor of Martin in the amount of $353,000 in damages and $341,418 in attorney's fees. The trial court's judgment also ordered Jurgens to pay damages of $79,978.38 to Alice's estate. Jurgens timely filed a motion for new trial that was overruled by operation of law. *See* TEX. R. CIV. P. 329(b).

Jurgens brings fifteen issues on appeal. Issues One through Four and Issue Six are jurisdictional issues. The first two issues relate to an *in terrorem* clause in Alice's will, and the second two issues relate to the ancillary nature of the underlying proceeding. Issue Six concerns Martin's standing to assert a claim for fraud on the community on behalf of his mother's estate. In Issue Five, Jurgens challenges the death penalty sanctions entered against her. In Issue Nine, Jurgens challenges evidentiary rulings made by the trial court. Jurgens challenges the terms of the final judgment in Issues Seven, Eight, Ten, Eleven, Twelve, Thirteen, and Fourteen. Finally, in Issue Fifteen, Jurgens challenges the trial court's denial of her motion for

---

[2]We will refer to Appellant Brenda Jurgens as "Jurgens," and we will refer to Appellee Gary Martin as "Martin."

2

new trial. We affirm in part, reverse and render in part, and reverse and remand in part.

*Background Facts*

Billy and Alice were the parents of Jurgens, Martin, and Greg Martin.[3] Billy passed away in September 2010. Alice passed away in June 2012.

Billy and Alice experienced health problems during their later years. Jurgens and Greg were both actively involved in taking care of their parents. Martin was not involved in taking care of either parent. He has been estranged from his family since 2000, and he admitted to having "very minimal" contact with his parents in the last five years before they passed away. Martin attributed his minimal contact with his parents to the alleged influence that Jurgens had over their parents.

Martin alleged that, for approximately the last four years of her life, Alice resided in nursing facilities and suffered from dementia and "an Alzheimer's-like condition." In August 2008, Alice signed a power of attorney granting Jurgens power over Alice's affairs. Nearly two years after Alice died, Jurgens produced a handwritten will that Alice had purportedly executed that appointed Jurgens as executor. In the will, Alice left Martin only a $100 specific cash bequest. Jurgens, Greg, and Alice's grandchildren were all to receive $1,000. The will also provided that Jurgens "will decide and oversee who gets what." Additionally, the will contained an *in terrorem* clause that provided as follows: "Alice wishes that if anyone contest [sic] this will that they be excluded from the will."

Soon after Jurgens's appointment as the executor of Alice's estate, Martin filed a will contest based on Alice's alleged lack of testamentary capacity when making the will that was admitted to probate. Martin then filed the underlying action

---

[3]We will refer to Greg Martin as "Greg."

asserting that Jurgens had misappropriated their parents' funds both before and after their deaths.

In the probate proceeding, Martin pursued discovery and filed multiple motions seeking to hold Jurgens in contempt for noncompliance with the trial court's discovery orders. The trial court entered oral and written discovery orders and contempt orders in the lawsuit underlying this appeal, ultimately imposing death penalty sanctions against Jurgens and entering a default judgment on liability due to Jurgens's noncompliance.

After a hearing on damages, the trial court entered the final judgment referenced above. In addition to the money judgment, the trial court imposed a constructive trust over all of Jurgens's assets, including her real property in Montana.

*Analysis*

*Subject-Matter Jurisdiction*

In her first four issues, Appellant challenges the trial court's subject-matter jurisdiction. Subject-matter jurisdiction is essential to the authority of a court to decide a case. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443 (Tex. 1993). Subject-matter jurisdiction is never presumed and cannot be waived. *Id.* at 443–44. Because subject-matter jurisdiction is a question of law, we review it de novo. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004).

In her first issue, Jurgens challenges Martin's standing to bring the underlying action. Based on the *in terrorem* clause, Jurgens contends that Martin's alleged injuries were purely conjectural or hypothetical when the underlying suit was filed because Alice's will had not been set aside. For the same reason, Jurgens asserts in her second issue that Martin's claims were not ripe.

In order for a court to have subject-matter jurisdiction, the plaintiff must have standing to sue, and the plaintiff's claim must be ripe. *Sw. Elec. Power Co. v. Lynch*, 595 S.W.3d 678, 683 (Tex. 2020). The doctrines of both standing and ripeness stem

4

from the prohibition of advisory opinions, which in turn is rooted in the separation-of-powers doctrine. *Patterson v. Planned Parenthood of Houston & Se. Tex., Inc.*, 971 S.W.2d 439, 442 (Tex. 1998).

Standing is a component of subject-matter jurisdiction and focuses on whether a party has a sufficient relationship with the lawsuit to have a justiciable interest in its outcome. *Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 848 (Tex. 2005). If a party lacks standing, the trial court lacks subject-matter jurisdiction to hear the case. *Id.* at 849. A party's standing to sue is implicit in the concept of subject-matter jurisdiction and will not be presumed—it must be proved. *Linegar v. DLA Piper LLP (US)*, 495 S.W.3d 276, 279 (Tex. 2016). In Texas, standing requires that the plaintiff have suffered a concrete and distinct injury and that there be a real controversy between the parties that will actually be resolved by the judicial relief sought. *Id.* (citing *Heckman v. Williamson Cty.*, 369 S.W.3d 137, 154–55 (Tex. 2012)). The plaintiff must show that it—rather than a third party or the public generally—was personally injured. *Heckman*, 369 S.W.3d at 155.

Like standing, ripeness "emphasizes the need for a concrete injury for a justiciable claim to be presented." *Sw. Elec. Power Co.*, 595 S.W.3d at 683 (quoting *Patterson*, 971 S.W.2d at 442). Standing focuses on the issue of who may bring an action, and ripeness focuses on when that action may be brought. *Waco Indep. Sch. Dist. v. Gibson*, 22 S.W.3d 849, 851 (Tex. 2000). In determining whether a case is ripe, the focus is on whether "the facts are sufficiently developed 'so that an injury has occurred or is likely to occur, rather than being contingent or remote'" at the time the lawsuit is filed. *Id.* at 851–52 (quoting *Patterson*, 971 S.W.2d at 442). If the plaintiff's injury is based on "hypothetical facts, or upon events that have not yet come to pass," then the case is not ripe, and the court lacks subject-matter jurisdiction. *Id.* at 852. A claim is not required to be ripe at the time of filing. *Robinson v. Parker*, 353 S.W.3d 753, 755 (Tex. 2011) (citing *Perry v. Del Rio*, 66

S.W.3d 239, 251 (Tex. 2001)). However, the plaintiff must be able to demonstrate a reasonable likelihood that the claim will soon ripen. *Id.* Also, "just as a case may become moot after it is filed, it may also ripen." *Perry*, 66 S.W.3d at 251.

Subject-matter jurisdiction is an issue that may be raised for the first time on appeal. *Tex. Air Control Bd.*, 852 S.W.2d at 445. Jurgens did not raise the issue of standing or ripeness in the trial court by filing a plea to the jurisdiction.[4] When an appellate court reviews the standing of a party or the ripeness of a controversy for the first time on appeal, it must construe the petition in favor of the party and, if necessary, review the entire record to determine if any evidence supports standing and ripeness. *Id.* at 446; *see Gibson*, 22 S.W.3d at 853. Based upon our review of the record, we conclude that Martin had a sufficient connection to the suit and a sufficiently ripe claim in order to vest the trial court with subject-matter jurisdiction.

Martin asserted in his original pleading that he was a "lawful heir" of Alice and Billy, a named beneficiary under Billy's will, and a named beneficiary under Alice's will. He further alleged that Jurgens was the current executor appointed for the estates of Alice and Billy. Martin alleged that Jurgens "abused her position as a fiduciary, both as power of attorney for Alice Jean Martin, but also as executor for the estates of Alice Jean Martin and Billy Martin."

Martin filed his claim in the underlying proceeding essentially as an effort to collect estate property from Jurgens, the executor of the estates. Ordinarily the personal representative of the estate of a decedent is the only person entitled to sue for the recovery of property belonging to the estate. *Moody v. Moody*, 613 S.W.3d 707, 718 (Tex. App.—Houston [14th Dist.] 2020, pet. filed) (citing *Shepherd v. Ledford*, 962 S.W.2d 28, 31 (Tex. 1998); *Frazier v. Wynn*, 472 S.W.2d 750, 752

---

[4]Jurgens raised the issues of standing and ripeness in a plea in abatement. However, the record does not indicate that the trial court issued a ruling on these issues.

(Tex. 1971); *Chandler v. Welborn*, 294 S.W.2d 801, 806 (Tex. 1956)); *In re Estate of Preston*, 346 S.W.3d 137, 163 (Tex. App.—Fort Worth 2011, no pet.). There is an exception to this general rule, however, when the personal representative cannot, or will not, bring the suit or when the personal representative's interests are antagonistic to those of the estate. *Moody*, 613 S.W.3d at 718 (citing *Chandler*, 294 S.W.2d at 806); *Estate of Preston*, 346 S.W.3d at 163. This exception is applicable to Martin's claims against Jurgens, the personal representative of their parents' estates, because the claims are brought against her.

We disagree with Jurgens's contention that Martin lacked standing or a ripe claim by virtue of either *in terrorem* clause or the small bequest to him under Alice's will. The underlying proceeding was filed in conjunction with the pending probate wherein Martin sought to invalidate the will that had been probated. Under the Estates Code, Martin was an "interested party" with standing to contest the will because he was an heir or devisee of the estate. *See* TEX. EST. CODE ANN. §§ 22.018(1), 256.204(a) (West 2020); *Ferreira v. Butler*, 575 S.W.3d 331, 334–35 (Tex. 2019). If Martin prevailed on his will contest, he would have a pecuniary interest in the recovery obtained in the underlying proceeding. *See Ferreira*, 575 S.W.3d at 335.

Martin was not required to successfully prosecute the will contest to conclusion in order to have standing in the underlying proceeding to recover estate property from Jurgens. We addressed a similar contention in *In re Estate of Redus*. We held in *Redus* that a claimant relying on a will for standing does not have to show that the will is valid in order to establish standing because the validity of the will is a question to be decided at a trial on the merits. 321 S.W.3d 160, 162–64 (Tex. App.—Eastland 2010, no pet.); *see Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000) (Procedurally, a plea to the jurisdiction is a dilatory plea, the purpose of which is generally to defeat an action "without regard to whether the

7

claims asserted have merit."). That principle applies to Martin's claim in the underlying proceeding—he was not required to have the will set aside in order to have a justiciable interest in the underlying suit's outcome. *See Lovato*, 171 S.W.3d at 848.

*In terrorem* clauses, also referred to as forfeiture or no-contest clauses, make gifts in a will or other instrument conditional on the beneficiary not challenging or disputing the validity of the instrument. *Di Portanova v. Monroe*, 402 S.W.3d 711, 715 (Tex. App.—Houston [1st Dist.] 2012, no pet.). Martin asserts that this clause and his subsequent challenge of the will's validity do not deny him the opportunity to sue Jurgens for breach of fiduciary duties. We agree. By statute, a forfeiture clause does not prevent a beneficiary from seeking redress against a fiduciary for breach of the fiduciary's duties. EST. § 254.005(b); *see Lesikar v. Moon*, 237 S.W.3d 361, 370–71 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (A beneficiary has an inherent right to challenge the actions of a fiduciary, and he does not trigger a forfeiture clause by doing so.); *McLendon v. McLendon*, 862 S.W.2d 662, 679 (Tex. App.—Dallas 1993, writ denied) ("The right to challenge a fiduciary's actions is inherent in the fiduciary/beneficiary relationship.").

In addition to his pleadings, the evidence in the record supports Martin's standing and establishes that his claims against Jurgens were ripe for consideration. Alice's physician, Eric L. Olson, M.D., testified that on the date the will was executed, Alice was totally incapacitated and not capable of making a will. Dr. Olson admitted her to hospice care on that same day. Using the power of attorney she had been granted by Alice, Jurgens wrote checks to herself for thousands of dollars from her parents' accounts, charged her parents' accounts for her own personal purchases, and ultimately was not able to account for all of the monetary transfers.

8

Jake Costin, a financial expert witness for Martin, examined all of the documents produced by Jurgens. Costin performed a reconciliation and determined that there were approximately $292,000 in charges and withdrawals from the accounts for which there were no receipts and no verification as being for the benefit of the estates. Additionally, after reconciling the funds, Costin testified that there was still approximately $61,000 missing from the estates. Accordingly, both Martin's pleadings and the evidence in the record establish that he had standing and a ripe claim. We overrule Jurgens's first and second issues.

In her third issue, Jurgens challenges the trial court's jurisdiction with respect to the amount in controversy. She contends that the trial court erred in refusing to dismiss Martin's claims because they exceeded the jurisdictional limit of the trial court. Jurgens asserts that the jurisdictional limit of the trial court for Martin's claims was $500,000 and that his claims exceeded that because he sought damages of at least $591,000. In that regard, Midland County courts at law have jurisdiction in civil cases in which the matter in controversy exceeds $500 but does not exceed $500,000 "as alleged on the face of the petition." TEX. GOV'T CODE ANN. § 25.1672(a)(2) (West 2019).

Conversely, Martin contends that the jurisdictional limit of Section 25.1672(a)(2) did not apply to his claims because the trial court was exercising probate jurisdiction over his claims. The trial court agreed with Jurgens's contention that the $500,000 limitation in Section 25.1672(a)(2) applied to Martin's claims. However, the trial court disagreed with Jurgens's contention that Martin had pleaded himself out of court because it permitted him to subsequently amend his pleadings to limit his recovery to $500,000.

County courts at law are courts of "limited jurisdiction." *United Servs. Auto Ass'n v. Brite*, 215 S.W.3d 400, 401 (Tex. 2007). "Statutory county courts are not courts of general jurisdiction 'with the power to hear and determine any cause that

9

is cognizable by courts of law or equity.'" *Eris v. Giannakopoulos*, 369 S.W.3d 618, 623 (Tex. App.—Houston [1st Dist.] 2012, pet. dism'd) (internal quotation marks omitted) (quoting *Thomas v. Long*, 207 S.W.3d 334, 340 (Tex. 2006) (describing general jurisdiction of district courts)). County courts at law have concurrent civil jurisdiction with the district court to the monetary limits set out by statute. *See* GOV'T § 25.0003(c) (West Supp. 2020). Thus, Midland County courts at law have concurrent civil jurisdiction with the district court when the matter in controversy is between $500 and $500,000. *Id.* § 25.1672(a)(2).

County courts at law also have concurrent original probate jurisdiction with the county court in counties that do not have a statutory probate court. *Id.* § 25.0003(d).[5] Midland County does not have a statutory probate court. When exercising original probate jurisdiction, a county court at law is not subject to the amount-in-controversy limits that would apply to civil cases generally. *English v. Cobb*, 593 S.W.2d 674, 675 (Tex. 1979); *Lee v. Hersey*, 223 S.W.3d 439, 444–45 (Tex. App.—Amarillo 2006, pet. denied); *Hailey v. Siglar*, 194 S.W.3d 74, 76 (Tex. App.—Texarkana 2006, pet. denied). Accordingly, the applicability of the $500,000 limit set out in Section 25.1672(a)(2) to Martin's claims depends on whether the trial court was exercising probate jurisdiction or general civil jurisdiction. *See Dowell v. Quiroz*, 462 S.W.3d 578, 585–86 (Tex. App.—Corpus Christi–Edinburg 2015, no pet.) (mem. op.).

Courts that have original probate jurisdiction have probate jurisdiction over two types of matters: "probate proceedings," *see* EST. §§ 31.001, 32.001(a), and "matters related to a probate proceeding," *see* EST. § 31.002, 32.001(a). The term "probate proceeding" is defined by Section 31.001 as eight enumerated matters.

---

[5]"Texas probate jurisdiction is, to say the least, somewhat complex." *Palmer v. Coble Wall Tr. Co.*, 851 S.W.2d 178, 180 n.3 (Tex. 1992).

Under Section 31.002, "a matter related to a probate proceeding" is determined by the type of trial court considering the matter. For a county court at law, the matters listed in Section 31.002(a) and (b) are matters related to a probate proceeding. EST. § 31.002(b).

Probate courts also have "pendant and ancillary jurisdiction as necessary to promote judicial efficiency and economy." *Id.* § 32.001(b). "Typically, probate courts exercise ancillary or pendent jurisdiction when a close relationship exists between the nonprobate claims and the claims against the estate." *Shell Cortez Pipeline Co. v. Shores*, 127 S.W.3d 286, 294 (Tex. App.—Fort Worth 2004, no pet.) (citing *Sabine Gas Trans. Co. v. Winnie Pipeline Co.*, 15 S.W.3d 199, 202 (Tex. App.—Houston [14th Dist.] 2000, no pet.)). As reflected in *Shores*, "pendant and ancillary" claims are nonprobate claims. *Id.* As a nonprobate claim, the amount-in-controversy limits of Section 25.1672(a)(2) would apply to an ancillary claim. *See, e.g.*, *Dowell*, 462 S.W.3d at 585–86.

In his petitions, Martin alleged that his claims were "ancillary" to the pending probate case for Alice's estate. However, "[w]e look to the substance of a plea for relief to determine the nature of the pleading, not merely at the form of title given to it." *State Bar of Tex. v. Heard*, 603 S.W.2d 829, 833 (Tex. 1980) (citing TEX. R. CIV. P. 71). As we previously noted, Martin's claims were in the nature of a claim seeking to recover estate property from Jurgens on behalf of the estates. Even though Martin used the label of "ancillary" in describing his claims, they were in fact matters related to a probate proceeding under Section 31.002 because they were claims "against a personal representative or former personal representative arising out of the representative's performance of the duties of a personal representative," *see* EST. § 31.002(a)(1), or claims "brought against a personal representative in the representative's capacity as personal representative," *see* EST. § 31.002(a)(4). As such, Martin's claims were not subject to the amount-in-controversy limits that

11

would apply to civil cases generally. *See English*, 593 S.W.2d at 675; *Dowell*, 462 S.W.3d at 585–86; *Lee*, 223 S.W.3d at 444–45; *Hailey*, 194 S.W.3d at 76.

We disagree with the trial court's determination that the $500,000 limit set out in Section 25.1672(a)(2) applied to Martin's claims. However, the trial court did not dismiss Martin's claims on this basis. Accordingly, the trial court did not err by not dismissing Martin's claims because he pleaded for damages in excess of $500,000. We overrule Jurgens's third issue.

Jurgens's fourth issue is related to her third issue. She contends that the trial court erred by permitting Martin to amend his pleadings to seek damages of $500,000 or less so that his claims would come within the amount-in-controversy limit of Section 25.1672(a)(2). Jurgens asserts that the trial court was without jurisdiction to permit Martin to amend his pleadings because he had pleaded himself out of court. This contention is premised on Jurgens's assertion that Martin's claims were subject to the $500,000 limit of Section 25.1672(a)(2). However, we rejected this contention in our disposition of Jurgens's third issue. For the same reason, we overrule Jurgens's fourth issue.

*Fraud on the Community*

In her sixth issue, Jurgens contends that Martin did not have standing to bring a claim for fraud on the community. In this regard, the final judgment ordered Jurgens to pay $79,978.38 in damages to Alice's estate for one-half of the amount of various accounts received by Jurgens. The trial court's findings of fact clarify that this recovery was for community property funds that were improperly gifted to Jurgens by Billy. The trial court determined that these gifted funds constituted a fraud against the community estate of Billy and Alice. Relying upon our holding in *Grothe v. Grothe*, Jurgens asserts that Martin did not have standing to assert a claim on behalf of Alice's estate. *See Grothe v. Grothe*, No. 11-14-00084-CV, 2016 WL

12

1274059, at *3–4 (Tex. App.—Eastland Mar. 31, 2016, no pet.) (mem. op.). We agree.

"Fraud on the community" is the wrongful disposition of community assets— it is "[t]he breach of a legal or equitable duty which violates [the] fiduciary relationship existing between spouses." *In re Marriage of Moore*, 890 S.W.2d 821, 827 (Tex. App.—Amarillo 1994, no writ). The Texas Supreme Court has held that there is not an independent tort for fraud on the community. *Schlueter v. Schlueter*, 975 S.W.2d 584, 586 (Tex. 1998). Rather, "[a] claim of fraud on the community is a means to an end, either to recover specific property wrongfully conveyed, . . . or . . . to obtain a greater share of the community estate upon divorce, in order to compensate the wronged spouse for his or her lost interest in the community estate." *Id.* at 588 (second and third alterations in original) (quoting *Belz v. Belz*, 667 S.W.2d 240, 247 (Tex. App.—Dallas 1984, writ ref'd n.r.e.)).

In *Grothe*, two children of a decedent asserted a claim on behalf of their father's estate against their stepmother for fraud on the community. 2016 WL 1274059, at *1. We noted that a claim for fraud on the community "is generally reserved for divorce proceedings and can be brought only by a party who has an interest in the community property itself." *Id.* at *4 (citing *Chu v. Hong*, 249 S.W.3d 441, 444–45 (Tex. 2008)). We held that an heir or personal representative of an estate cannot bring a claim for fraud on the community estate. *Id.* at *3–4. We concluded that an heir or personal representative does not have standing to bring a claim for fraud on the community. *Id.*

Our holding in *Grothe* that an heir or personal representative of an estate does not have standing to assert a claim for fraud on the community is significant from a procedural standpoint. As we noted above, standing can be raised for the first time on appeal because it is a component of subject-matter jurisdiction. *See Tex. Air*

13

*Control Bd.*, 852 S.W.2d at 445. In this regard, Jurgens did not assert in the trial court that Martin did not have standing to assert a claim for fraud on the community.

We relied on *Harper v. Harper* for our holding in *Grothe*. *See Harper v. Harper*, 8 S.W.3d 782 (Tex. App.—Fort Worth 1999, pet. denied). *Harper* involved similar facts—an executor of an estate bringing a claim for fraud on the community against his stepmother. *Id.* at 783. The Fort Worth Court of Appeals held that an independent cause of action for fraud on the community does not survive a spouse's death for the benefit of that spouse's estate. *Id.* at 783–84. The court relied on the Texas Supreme Court's holding in *Schlueter* that there is no independent tort cause of action for wrongful disposition by a spouse of community assets. *Id.* at 784 (citing *Schlueter*, 975 S.W.2d at 589).

Martin asserts that *Grothe* is inapplicable to his claim for fraud on the community because he is not suing a surviving spouse. He contends that his claim is distinguishable because he is suing an "unjustly-enriched fiduciary" for a return of "wrongfully received funds." Martin further asserts that the decision in *Harper* was not based on standing. Based on these contentions, Martin asserts that Jurgens failed to preserve error because she did not present her claim in the trial court. We disagree with Martin's analysis.

Our holding in *Grothe* that an heir or personal representative of an estate does not have standing to assert a claim for fraud on the community was not based on the identity of the defendant. 2016 WL 1274059, at *3–4. Instead, it was based on our conclusion that the heir or personal representative "did not have a justiciable interest in the community property." *Id.* at *3. The court in *Harper* concluded that a claim for fraud on the community does not survive the death of the allegedly defrauded spouse, which in this case is Alice. *See Harper*, 8 S.W.3d at 783–84. Thus, when Alice died, the claim for fraud on the community expired, and her estate no longer had a justiciable interest for the purpose of standing. *See id.*

14

The Corpus Christi–Edinburg Court of Appeals addressed an analogous situation in *Wackenhut Corrections Corp. v. de la Rosa*, 305 S.W.3d 594, 632–34 (Tex. App.—Corpus Christi–Edinburg 2009, no pet.), *abrogated on other grounds by Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143 (Tex. 2015). In *Wackenhut*, a wrongful death claimant died prior to trial. 305 S.W.3d at 632. The defendant asserted that the decedent's estate no longer had standing to assert the claim because the wrongful death claim did not survive the decedent's death. *Id.*; *see Coffey v. Johnson*, 142 S.W.3d 414, 417 (Tex. App.—Eastland 2004, no pet.) (a claim for wrongful death does not survive the claimant's death). Conversely, the decedent's estate asserted that the matter did not involve standing and that the defendant had failed to sufficiently present the complaint in the trial court. The court agreed with the defendant's contention by holding that the decedent's estate did not have standing to assert the wrongful death claim. *Wackenhut*, 305 S.W.3d at 632–33.

The court in *Wackenhut* cited *Lovato* for the proposition "that an estate's standing to pursue a decedent's claim depends on whether the claim survives the death." *Id.* at 633 (citing *Lovato*, 171 S.W.3d at 850). *Lovato* dealt with the opposite situation—an estate continued to have a justiciable interest in a claim that survived the decedent's death. 171 S.W.3d at 850 ("Because a decedent's survival claim becomes part of her estate at death, it follows that the estate retains a justiciable interest in the survival action." (footnote omitted)); *see also Belt v. Oppenheimer, Blend, Harrison & Tate, Inc.*, 192 S.W.3d 780, 786 (Tex. 2006) ("Because legal malpractice claims survive in favor of the decedent's estate, the estate has a justiciable interest in the controversy sufficient to confer standing."). Thus, the court in *Wackenhut* concluded that, because the decedent's wrongful death claim did not survive his death, his estate lacked standing to pursue the claim. 305 S.W.3d at 634.

We agree with the reasoning in *Wackenhut*. Alice's claim for fraud on the community did not survive her death. *See Harper*, 8 S.W.3d at 783–84. Thus,

Alice's estate did not have standing to assert a claim for fraud on the community. *See Wackenhut*, 305 S.W.3d at 634. Accordingly, we reaffirm our holding in *Grothe* that an heir or a personal representative of an estate does not have standing to prosecute a claim for fraud on the community because the estate does not have standing to purse the claim. As applied to the facts in the case, Jurgens may raise for the first time on appeal the issue of Martin's standing to assert a claim on behalf of Alice's estate for fraud on the community. We agree that Martin did not have standing to assert the claim. We sustain Jurgens's sixth issue. We reverse the judgment of the trial court as to Martin's claim for fraud on the community in the amount of $79,978.38, and we render judgment that Alice's estate takes nothing on that claim.

*Death Penalty Sanctions*

In her fifth issue, Jurgens contends that the trial court abused its discretion by imposing death penalty sanctions and entering an interlocutory default judgment as to liability. Jurgens asserts that the sanctions were unjust because (1) the discovery motions and orders upon which the death penalty sanctions were based were filed in a separate lawsuit; (2) the trial court punished her for her inability to produce documents that were not within her possession, custody, and control; (3) there was a lack of harm to Martin; (4) the discovery orders and contempt orders were not specific enough; (5) some of the discovery problems were due solely to Jurgens's trial counsel; (6) Jurgens's defenses were not meritless; (7) the trial court sanctioned her for supplementing her discovery; (8) the trial court sanctioned her based on credibility issues; and (9) her actions did not reflect bad faith. Jurgens contends that she attempted in good faith to comply with overly broad and ever-changing discovery orders and requests. As such, she contends that the trial court erred in adjudicating the merits of her defenses without ever going to trial.

16

We review a trial court's decision to impose discovery sanctions for an abuse of discretion. *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). A trial court abuses its discretion when its ruling is arbitrary, unreasonable, or without reference to any guiding rules or legal principles. *Id.*; *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). An appellate court reviews the entire record, including the evidence, arguments of counsel, written discovery on file, and the circumstances surrounding the party's discovery abuse. *Tidrow v. Roth*, 189 S.W.3d 408, 412 (Tex. App.—Dallas 2006, no pet.).

A trial court has discretion to impose sanctions for discovery abuses under Rule 215 of the Texas Rules of Civil Procedure. TEX. R. CIV. P. 215. If a party fails to comply with an order compelling discovery or abuses the discovery process, a trial court can strike the party's pleadings or render a judgment by default after notice and hearing. TEX. R. CIV. P. 215.2(b)(5), 215.3. Any sanction by the trial court that is based on the party's conduct during discovery, and by which a trial court adjudicates a party's claim without regard to the merits, constitutes a "death-penalty" sanction. *State v. Bristol Hotel Asset Co.*, 65 S.W.3d 638, 647 (Tex. 2001) (Baker, J., dissenting). Because the ultimate sanction imposed here was the striking of Jurgens's pleadings, we also consider whether Jurgens's conduct justified the presumption that her claims or defenses lacked merit. *Paradigm Oil, Inc. v. Retamco Operating, Inc.*, 372 S.W.3d 177, 184 (Tex. 2012) ("Thus, a death-penalty sanction cannot be used to adjudicate the merits of claims or defenses unless the offending party's conduct during discovery justifies a presumption that its claims or defenses lack merit.").

Discovery sanctions serve three purposes: (1) to secure compliance with discovery rules; (2) to deter other litigants from similar misconduct; and (3) to punish parties for violating the discovery rules. *Response Time, Inc. v. Sterling Commerce (N. Am.), Inc.*, 95 S.W.3d 656, 659 (Tex. App.—Dallas 2002, no pet.).

17

When an appellate court determines whether sanctions imposed are just, it is to consider (1) whether there is a direct relationship between the offensive conduct and the sanctions imposed and (2) whether the sanctions are excessive. *TransAmerican Nat. Gas Corp. v. Powell*, 811 S.W.2d 913, 917 (Tex. 1991). Further, the trial court should always consider and test lesser sanctions before imposing case-determinative sanctions. *Chrysler Corp. v. Blackmon*, 841 S.W.2d 844, 849 (Tex. 1992). As noted in *TransAmerican*:

> Discovery sanctions cannot be used to adjudicate the merits of a party's claims or defenses unless a party's hindrance of the discovery process justifies a presumption that its claims or defenses lack merit. However, if a party refuses to produce material evidence, despite the imposition of lesser sanctions, the court may presume that an asserted claim or defense lacks merit and dispose of it. . . . Sanctions which are so severe as to preclude presentation of the merits of the case should not be assessed absent a party's flagrant bad faith or counsel's callous disregard for the responsibilities of discovery under the rules.

811 S.W.2d at 918 (citations omitted).

The death penalty sanctions in this case had their genesis in an agreed discovery order entered in the probate case of Alice's estate on December 5, 2014.[6] This order required Jurgens to "serve upon counsel for Petitioner Gary H. Martin all property, estate, and financial records of John William (Billy) and Alice Martin, from August 1, 2008 to the present date including without limitation the following categories of documents."[7] The order listed seventeen categories of documents for which Jurgens was required to produce "all" documents. Jurgens was required by the agreed discovery order to produce these documents on or before January 2, 2015.

---

[6] Unless otherwise noted, "probate case" as used in this opinion refers to the probate case for Alice's estate.

[7] At the time of the entry of the agreed order, Martin had filed a will contest to the will that Jurgens filed for probate in Alice's estate. However, the underlying action had not yet been filed.

On January 7, 2015, Martin filed in the probate case a Motion to Show Cause and for Contempt for Violation of Agreed Order. He alleged that Jurgens had failed to comply with the agreed order by the deadline of January 2, 2015. Martin also alleged that, although Jurgens had provided some documents after January 2, she had failed to provide most of the records for Alice's estate.

The trial court heard this motion in the probate case on February 13, 2015. Jurgens was represented at this hearing by counsel that she had recently hired. Martin's counsel advised the trial court that Jurgens's counsel had been helpful in providing some documents but that several categories of documents had not been produced, including bank records for several accounts. Jurgens's attorney explained that it was not Jurgens's intent to not comply with the discovery order. Jurgens's attorney also acknowledged that Jurgens had not produced some of the documents that she had been requested to produce. The trial court gave Jurgens until March 16 to "comply completely" with the agreed order. The trial court also ordered Jurgens to provide records for a bank account that Jurgens asserted was her own account.

The trial court additionally granted Jurgens's request to have Martin's counsel provide her with a list of the accounts or items for which Martin needed information. Martin's counsel subsequently sent Jurgens's counsel a letter on February 3, 2015, that listed the items for which Martin sought documentation. The letter listed thirty different items that Martin asserted were missing from the production under the agreed order.

Martin filed the underlying action on March 14, 2015. The next hearing occurred on May 6, 2015. The reporter's record for this hearing bears the caption for both the probate case and the underlying action. Among other things, the trial court considered Martin's motion for contempt and motion to compel in the probate case. Martin's counsel detailed the difficulty Martin experienced in getting discovery from Jurgens by using the sale of Billy and Alice's house as an example.

19

Martin's counsel advised the trial court that Jurgens had still not presented a clear depiction of what had happened to the sale proceeds of the home and that Jurgens had presented five different versions of what had occurred with the sale. Martin characterized Jurgens's compliance with discovery orders as "a game of catch me if you can," and he indicated that he had spent "thousands of dollars" trying to obtain discovery from Jurgens.

The May 6 hearing also addressed Martin's motion for a temporary injunction in the underlying matter. During Jurgens's testimony, the matter of Jurgens paying funds to herself from Alice's accounts was addressed. Jurgens stated that she paid these funds to reimburse herself for expenditures that she made on behalf of Alice. The trial court asked Jurgens if she had documentation to back up the expenses that she asserted she had paid for Alice. Jurgens replied, "Absolutely." Jurgens also testified that she sometimes transferred funds from her personal accounts to Alice's account to offset personal expenditures that she or someone erroneously made from Alice's accounts. As a result of these transfers, the trial court directed Jurgens to provide documents for her personal accounts.

At the conclusion of the May 6 hearing, the trial court stated that a lot of the issues in the cases remained unresolved because of Jurgens's failure to provide the documents that she was supposed to provide. The trial court commended Jurgens's counsel based on the fact that "until [he] got to this [matter], we didn't get much discovery." However, the trial court noted that Jurgens's document production remained incomplete, and it ordered her to complete discovery by June 19, 2015. The trial court commented that Jurgens's "excuses with me have run out" and that there would be no acceptable excuses if she failed to produce everything by June 19. The trial court found Jurgens in contempt for failing to provide the discovery required by the agreed discovery order of December 5, 2014, and it assessed a fine of $1,000 and a probated jail sentence of thirty days.

The next court hearing occurred on July 7, 2015. The reporter's record for this hearing also bears the caption for both the probate case and the underlying action. During the consideration of Martin's motion to remove Jurgens as independent executor of Alice's estate, Martin's counsel advised the trial court that Jurgens had not produced supporting documentation for checks that she had written herself from Alice's accounts. Martin's counsel also advised the trial court that Jurgens had not paid the $1,000 sanction imposed at the conclusion of the previous hearing. The trial court denied Martin's motion to remove Jurgens as the independent executor. However, it was unable to issue a ruling on Martin's request for enforcement and sanctions because Jurgens had recently filed bankruptcy.

The fourth hearing occurred on January 28, 2016. The reporter's record for this hearing only bears the caption for the underlying action. The trial court heard Martin's June 2015 motion for enforcement, contempt, and sanctions at this hearing. At the end of the hearing, the trial court noted that Jurgens had not produced checks that Martin's attorney was able to obtain by subpoenaing banks. The trial court also noted that it had ordered Jurgens to produce all documents, thus implying that Jurgens should have produced the checks that Martin had to obtain from third parties.

The trial court found Jurgens in contempt for failing to produce these checks, and it assessed an additional sanction of $2,500. The trial court also ordered Jurgens to supplement her document production within twenty days of the hearing. Martin then presented an oral request to the trial court to strike Jurgens's pleadings as a discovery sanction. The trial court delayed ruling on Martin's request for death penalty sanctions by stating, "I'm going to keep that open as an option for the Court. I'm going to keep that open because it's going to depend on what happens out of [Jurgens's] deposition that we're about to order here in a little while."

The next hearing occurred on July 26, 2016. The reporter's record for this hearing only bears the caption for the underlying action. Jurgens appeared pro se at

21

this hearing because her attorneys had previously filed a motion to withdraw, which the trial court had granted. The trial court considered Martin's motion for enforcement, contempt, and sanctions. Martin's counsel advised the trial court that Jurgens had not paid the $2,500 sanction and that she had failed to produce all of the records that were required of her to be produced. Martin's counsel also informed the trial court about a discrepancy in an answer that Jurgens gave to a deposition question about a $10,000 payment that was allegedly made for the benefit of Alice. Specifically, Jurgens stated that the $10,000 payment was for a law firm to advise Jurgens about moving Alice to Montana. However, an attorney at the firm testified that the firm did not advise Jurgens on a matter concerning Alice but, rather, that the firm represented Jurgens in a lawsuit she had with a landscaping company. Jurgens also stated that her secretary had entered her purse and retrieved the wrong debit card to pay for Jurgens's personal expenses, including a cruise and plumbing bill, from Alice's account. However, Martin deposed the secretary and she testified that she had never gone into Jurgens's purse or wallet.

Jurgens asserted at the July 26 hearing that she relied on her attorneys to comply with the document production requirements. She also asserted that they told her to produce only what was in her "possession, custody or control" but that her attorneys' interpretation differed with the trial court's interpretation of that term. Jurgens claimed that she had "basically done every single thing for over a year [to comply with the document production]." She faulted banks for not complying with document requests presented by her and her attorneys. Jurgens stated that she did not know what to do "other than throw [herself] at the mercy of the Court." She begged the court for help, stating that she had been misled by her attorneys.

Martin's attorney responded to Jurgens's arguments by asserting that Jurgens had only produced documents in the past after the trial court had entered the previous contempt and sanction orders. Martin also asserted that Jurgens had still not

22

produced receipts for $292,000 in purchases that were purportedly made on behalf of Alice. Martin asserted that he could not litigate his case until Jurgens complied with the document production and that he had incurred attorney's fees of $15,000 in preparation for the July 26 hearing. Martin again requested that the trial court strike Jurgens's pleadings for discovery abuse.

The trial court did not strike Jurgens's pleadings at the July 26 hearing. The trial court also did not grant Martin's oral request to impose a constructive trust on Jurgens's home in Montana. Instead, the trial court ordered Jurgens to pay the $2,500 that it had previously ordered within thirty days. The trial court also ordered Jurgens to pay an additional sanction of $10,000 within sixty days. Finally, the trial court ordered Jurgens to produce everything required by the agreed discovery order within ninety days. The trial court encouraged Jurgens to retain new counsel in order to comply with the agreed discovery order, and it noted that it gave her ninety days to produce everything in order to give her time to find counsel to assist her.

The next hearing concerning discovery occurred on June 1, 2017, nearly a year after the previous discovery hearing. The reporter's record for this hearing bears the caption for both the probate case and the underlying action. This hearing was for the purpose of considering Martin's request for death penalty sanctions. Jurgens appeared pro se at this hearing. The trial court explained at the outset of the hearing that, while it had not consolidated the cases, they were both "concerned with each other" and that granting Martin's request for death penalty sanctions in the underlying proceeding would have an effect in the probate case. Martin's attorney noted that he had served a subpoena *duces tecum* on Jurgens to produce documents one week prior to her deposition but that she did not comply with the subpoena as required. Martin cited Jurgens's noncompliance with the subpoena as another example of Jurgens's "ongoing pattern of failure to honor Court orders." Martin asked the trial court to strike all of Jurgens's pleadings.

23

In response, Jurgens asserted that she "Googled" the term "duces tecum" and from that she determined that she just needed to bring the documents with her to her deposition. She also stated that she was having difficulty producing the documents "from the beginning" and that she was working to get things "untangled." She stated that she had not been able to locate boxes that contained relevant records. Jurgens asserted that she had "tried extremely hard" to comply with the document production and that she "would beg of [the trial court] to please take this case to trial." The trial court gave the following response to Jurgens:

> I will tell you that the Court has had as much patience as I could muster in dealing with you, Ms. Jurgens, through the life of this case. I can't think of a case that is more appropriate -- and this is something that is kind of an extraordinary relief in terms of the Court that this Court has ever granted. I am going to strike your pleadings in this case and I am going to grant judgment in favor of the Plaintiff in these cases.

The trial court entered an interlocutory order granting Martin's motion for death penalty sanctions and entry of default judgment. The order contained a detailed history of Jurgens's failures to comply with the agreed discovery order during the three plus years that the underlying proceeding had been on file. The order also contained a finding that "[Jurgens] has still not fully complied with the Court's orders of production." The trial court also found that Jurgens abused her position as a fiduciary and that Jurgens misappropriated estate funds for her own benefit to the detriment of Martin and the other heirs and beneficiaries.

With the assistance of counsel, Jurgens challenged the interlocutory order by filing a motion for new trial, which the trial court permitted to be overruled by operation of law. The trial court then conducted a prove-up hearing on December 20, 2017, as to damages. At the conclusion of the hearing, the trial court entered final judgment against Jurgens. Jurgens then filed another motion for new trial that was also overruled by operation of law.

24

Jurgens first challenges the death penalty sanction on the basis that the agreed discovery order of December 5, 2014, was entered in the probate case. However, Jurgens did not present this argument to the trial court as a basis for setting aside the death penalty sanctions despite the fact that she filed two motions for new trial. Furthermore, Jurgens never objected to the trial court's numerous orders in the underlying proceeding requiring her to comply with the agreed discovery orders or the imposition of sanctions in the underlying proceeding on the basis that the agreed discovery order was initially entered in the probate proceeding. Our rules for preservation of error preclude a party from raising a complaint for the first time on appeal. *Burbage v. Burbage*, 447 S.W.3d 249, 258 (Tex. 2014). Accordingly, Jurgens failed to preserve this argument for our review. *See* Tex. R. App. P. 33.1.

Moreover, we have previously noted the related nature of the underlying proceeding to the probate case. Many of the hearings occurred in both cases at the same time. And while the trial court did not consolidate the actions, it obviously considered the terms of the agreed discovery order to be applicable to the underlying proceeding. The trial court also noted at the damages prove-up hearing that the probate case and the underlying action were "concerned with each other." Thus, the trial court did not err by sanctioning Jurgens in the underlying proceeding on the basis that the agreed discovery order was originally entered in the probate case.

Jurgens next complains that the trial court punished her for her inability to produce documents that were not within her possession, custody, or control. Jurgens focuses this contention on the fact that the death penalty sanctions were based in part on her failure to produce bank records. She cites the applicable discovery rule for the proposition that a party is only required to produce those documents that are "within the person's possession, custody, or control." *See* Tex. R. Civ. P. 196.3(a); *see also* Tex. R. Civ. P. 192.3(b). Jurgens asserts that bank records that are not in her possession do not fall within the purview of the rule.

25

As noted previously, the trial court did not impose death penalty sanctions solely because Jurgens did not produce bank records. For example, Jurgens did not produce itemized receipts for $292,000 in purchases that she alleged she had made for Alice's benefit—despite her representations to the court that she had this documentation. The agreed discovery order, which Jurgens and her attorney at the time signed, required the production of "all property, estate[,] and financial records" of Billy and Alice "without limitation." Thus, the agreed discovery order did not provide an exception for documents that were not within Jurgens's possession, custody, or control.

The agreed discovery order required Jurgens to produce documents relevant to the performance of her fiduciary duties as the executor of Billy's and Alice's estates and as the attorney-in-fact under Alice's power of attorney. In *Cartwright v. Minton*, we noted as follows concerning the duties of an executor:

> As executor of the estate, appellee occupied a position of trust to all parties having an interest in the estate. Because of his confidential and fiducial relationship[8] to appellant he owed her the highest degree of fidelity. It was his duty to fully and fairly disclose to her all of the pertinent facts as candidly as possible.

318 S.W.2d 449, 453 (Tex. App.—Eastland 1958, writ ref'd n.r.e.) (citation omitted). An executor owes a fiduciary duty of full disclosure of all material facts known to the executor that might affect an heir's or a devisee's rights, even if their relations are strained. *Montgomery v. Kennedy*, 669 S.W.2d 309, 313 (Tex. 1984).

---

[8]In *Cartwight*, we also described a fiduciary relationship in the following terms:

> The term "fiduciary" is derived from the civil law. It is impossible to give a definition of the term that is comprehensive enough to cover all cases. Generally speaking, it applies to any person who occupies a position of peculiar confidence towards another. It refers to integrity and fidelity. It contemplates fair dealing and good faith, rather than legal obligation, as the basis of the transaction. The term includes those informal relations which exist whenever one party trusts and relies upon another, as well as technical fiduciary relations.

318 S.W.2d 449, 453 (Tex. App.—Eastland 1958, writ ref'd n.r.e.).

A person holding a power of attorney also owes a fiduciary duty to his principal. *See Plummer v. Estate of Plummer*, 51 S.W.3d 840, 842 (Tex. App.—Texarkana 2001, pet. denied). An attorney-in-fact also has a duty to account to the principal's estate for actions taken under the power of attorney. *See Dawson v. Lowrey*, 441 S.W.3d 825, 833 (Tex. App.—Texarkana 2014, no pet.). In summary, a fiduciary "owes its principal a high duty of good faith, fair dealing, honest performance, and strict accountability." *Ludlow v. DeBerry*, 959 S.W.2d 265, 279 (Tex. App.—Houston [14th Dist.] 1997, no writ). Thus, as a fiduciary, Jurgens had a higher duty of disclosure than the typical opposing party.

Additionally, the rules of civil procedure provide that "[*p*]ossession, [*c*]ustody, or [*c*]ontrol of an item means that the person either has physical possession of the item or has a right to possession of the item that is equal or superior to the person who has physical possession of the item." TEX. R. CIV. P. 192.7(b). Thus, a party must produce items it either physically possesses or constructively possesses, meaning the party has the right to obtain possession from a third party, such as an agent or representative. *GTE Commc'ns Sys. Corp. v. Tanner*, 856 S.W.2d 725, 729 (Tex. 1993). At a minimum, Jurgens had constructive possession of the bank records because they were either her own accounts or accounts that she had authority over as power of attorney and executor of Alice's estate. Accordingly, the trial court did not abuse its discretion by entering death penalty sanctions because it did not order Jurgens to produce documents that were not within her possession, custody, or control.

Jurgens next asserts that Martin did not suffer harm from her failure to produce documents. She contends that Martin obtained several documents on his own and that many documents no longer existed, including Jurgens's itemized receipts for purchases that she had made. We disagree with Jurgens's assertion that "Martin suffered no true prejudice" as a result of her failure to produce documents.

27

Jurgens's noncompliance with the agreed discovery order required Martin to incur attorney's fees of several thousand dollars to file numerous motions and attend court hearings in order to obtain production.[9]  Also, both Martin's attorney and the trial court noted that Jurgens's noncompliance precluded a quicker resolution of the case.

Jurgens next contends that the discovery orders and contempt orders were not specific enough to justify the imposition of death penalty sanctions.  She asserts that the agreed discovery order was "vast in scope and lacking in specificity."  Jurgens faults the trial court for not identifying the specific documents that she had failed to produce.  We disagree with Jurgens's analysis.  We first note that she did not present a complaint to the trial court that death penalty sanctions were improper because the orders were not specific enough.  Therefore, Jurgens has not preserved this argument for appellate review.  See TEX. R. APP. P. 33.1.

We further note that, while Jurgens asserted at the July 26, 2016 hearing that she did not know what else she needed to produce, she was unwilling to pay Martin's attorney's fees that would be incurred to produce this list for her.  Martin's attorney had previously provided Jurgens's attorney a letter listing thirty items for which Martin was seeking production.  Additionally, the reporter's records from the discovery hearings detailed the deficiencies in Jurgens's document production.

Jurgens next asserts that some of the discovery problems were due solely to her trial counsel and that the trial court failed to properly apportion fault between her and her attorneys.  She cites her argument[10] at the July 26, 2016 hearing where she attributed her production shortcomings to her former counsel.  She contends that the sanctions imposed against her were improper because the trial court did not

---

[9]The two attorneys that represented Martin in the discovery hearings presented fee affidavits totaling in excess of $450,000.

[10]Jurgens appeared pro se at the July 26, 2016 hearing.  She did not present sworn testimony at this hearing.  Instead, she presented arguments to the trial court in response to Martin's attorney's argument seeking enforcement, sanctions, and contempt.

apportion them between her conduct versus her attorney's conduct and because the trial court improperly apportioned the sanctions solely to her conduct.

As noted in *TransAmerican*:

The trial court must at least attempt to determine whether the offensive conduct is attributable to counsel only, or to the party only, or to both. This we recognize will not be an easy matter in many instances. On the one hand, a lawyer cannot shield his client from sanctions; a party must bear some responsibility for its counsel's discovery abuses when it is or should be aware of counsel's conduct and the violation of discovery rules. On the other hand, a party should not be punished for counsel's conduct in which it is not implicated apart from having entrusted to counsel its legal representation. The point is, the sanctions the trial court imposes must relate directly to the abuse found.

811 S.W.2d at 917. This case is not one where the sanctioned party was represented by counsel during the entire pendency of the case. Jurgens was pro se for over a year prior to the imposition of the death penalty sanctions.

Jurgens's claims that her attorneys were responsible for her discovery shortcomings were based entirely upon her arguments to the trial court. At a discovery hearing, the trial court is entitled to judge the credibility of the witnesses and the weight to be given their testimony because it has the opportunity to observe the demeanor of the witnesses. *Daniel v. Kelley Oil Corp.*, 981 S.W.2d 230, 232 (Tex. App.—Houston [1st Dist.] 1998, pet. denied) (en banc); *City of Dallas v. Cox*, 793 S.W.2d 701, 724 (Tex. App.—Dallas 1990, no writ). The trial court may believe all, none, or part of the witnesses' testimony. *Cox*, 793 S.W.2d at 724; *Tate v. Commodore Cty. Mut. Ins. Co.*, 767 S.W.2d 219, 224 (Tex. App.—Dallas 1989, writ denied). Accordingly, it was within the trial court's province to reject Jurgens's claims that her attorneys were at fault for her discovery inadequacies.

The reporter's records from the discovery hearings provided the trial court with ample evidence to apportion fault between Jurgens and her counsel. As noted previously, the trial court commended Jurgens's trial counsel for assisting in the

discovery process. Additionally, after Jurgens became pro se, the trial court recommended to Jurgens that she retain new counsel to obtain assistance for complying with discovery. On this record, the trial court did not abuse its discretion by apportioning fault solely on Jurgens for the discovery noncompliance.

Jurgens next asserts that the trial court erred in concluding that her reimbursement claims against the estate lacked merit. She asserts that she did not need individual receipts because her credit card statements should have been sufficient. Jurgens asserted at trial that she believed credit card statements were sufficient because the IRS accepts them as valid proof.[11] We disagree with Jurgens's contention that her credit card statements were sufficient to show the nature of her purchases as being for the benefit of Alice. While the credit card statements show the amount of the purchases and the retailers involved, they do not show the items purchased or for whom the items were purchased. Many of the credit card purchases were made in Montana where Jurgens lived, and their connection to Alice, who lived in Midland, was not self-evident.

All transactions between a fiduciary and her principal are presumptively fraudulent and void; therefore, the burden lies on the fiduciary to establish the validity of any particular transaction in which she is involved. *Lesikar v. Rappeport*, 33 S.W.3d 282, 298 (Tex. App.—Texarkana 2000, pet. denied). In transactions involving parties with a fiduciary relationship, "equity indulges the presumption of unfairness and invalidity, and requires proof at the hand of the party claiming validity and benefits of the transaction that it is fair and reasonable." *Sorrell v. Elsey*, 748 S.W.2d 584, 585 (Tex. App.—San Antonio 1988, writ denied) (quoting *Stephens Cty. Museum, Inc. v. Swenson*, 517 S.W.2d 257, 260 (Tex. 1974)). Accordingly, we disagree with Jurgens's contention that her reimbursement claims

---

[11]We express no opinion on Jurgens's contention that credit card statements are sufficient for IRS purposes.

were in the nature of a defense. She had the burden of disproving the presumption of invalidity that attached to the transactions.

Jurgens told the trial court that she had documentation to justify the transactions involving the use of funds from Alice's estate. However, she never produced sufficient documentation. Furthermore, in at least two instances involving third parties, Jurgens's version of the events differed from the sworn testimony that Martin later obtained from the third parties. Accordingly, the trial court did not err by concluding that Jurgens's claims lacked merit.

Jurgens next asserts that the trial court sanctioned her for supplementing her discovery because sanctions were imposed even though she continued to supplement her discovery. We disagree. The reporter's records reflect that the trial court gave Jurgens numerous opportunities to supplement her deficient discovery despite the fact that she had not timely complied with discovery. The trial court only imposed death penalty sanctions after Jurgens failed to supplement her discovery.

Jurgens next contends that the trial court erred by imposing death penalty sanctions because it did so based on its determination that she was not credible. She contends that only a jury could make a credibility determination. As we previously noted, however, the trial court is tasked with making credibility determinations in the discovery context. *Daniel*, 981 S.W.2d at 232; *Cox*, 793 S.W.2d at 724. Accordingly, the trial court did not err by imposing death penalty sanctions based on its determination of Jurgens's credibility.

Finally, Jurgens asserts that her actions did not reflect bad faith. She notes that she produced 3,205 pages of documents, that she subpoenaed third parties for documents, that she paid all monetary sanctions imposed against her, and that she communicated with her trial counsel to ensure compliance. Jurgens contends that death penalty sanctions should be a sanction of last resort, not first resort, and that no lesser sanctions were imposed in the underlying proceeding.

We disagree with Jurgens's assertion that no prior sanctions were entered in the underlying suit. As we noted in our discussion of the discovery hearings, many of the hearings occurred only in the underlying proceeding while others occurred in both it and the probate case. We have also noted the related nature of the two proceedings. The death penalty sanctions in this case were not the first resort—as alleged by Jurgens in her brief. In this case, the trial court ordered Jurgens to produce additional documents on five occasions, held her in contempt on two occasions, and imposed progressive monetary sanctions on three occasions. The trial court repeatedly warned Jurgens that her pleadings would be stricken if she did not comply with discovery requests, and it encouraged her to obtain counsel in order to comply. As reflected in the trial court's statement when it imposed the death penalty sanctions against Jurgens, they were the last resort.

The court in *TransAmerican* stated that death penalty sanctions should be the "exception rather than the rule." 811 S.W.2d at 919. They are never justified unless there is an affirmative showing of "flagrant bad faith" or "callous disregard" for the rules. *Id*. at 918. While sanctions can promote the orderly conduct of court proceedings by securing compliance and deterring noncompliance with court orders, a "trial by sanctions" should be avoided whenever possible. *Altesse Healthcare Sols., Inc. v. Wilson*, 540 S.W.3d 570, 575 (Tex. 2018). Case-determinative sanctions may be imposed only in "'exceptional cases' where they are 'clearly justified' and it is 'fully apparent that no lesser sanctions would promote compliance with the rules.'" *Cire*, 134 S.W.3d at 840–41 (quoting *GTE*, 856 S.W.2d at 729–30).

The death penalty sanctions imposed by the trial court in this case comply with the two-part standard established by *TransAmerican*. *See* 811 S.W.2d at 917. There was a direct relationship between the offensive conduct and the sanction imposed because Jurgens's failure to produce complete documentation of what she

32

did as a fiduciary justifies a presumption that she abused her role to the prejudice of Martin and the other heirs and devisees. Jurgens failed to comply with discovery orders throughout the trial proceedings despite the imposition of lesser, progressive sanctions. The death penalty sanctions imposed by the trial court "fit the crime" because Jurgens's actions as a fiduciary indicate that she engaged in self-dealing and commingling of accounts for which she could not adequately account. *See TransAmerican*, 811 S.W.2d at 917. We conclude that the trial court did not abuse its discretion in imposing death penalty sanctions and striking Jurgens's pleadings. We overrule Jurgens's fifth issue.

*Evidentiary Objections*

In her ninth issue, Jurgens raises numerous evidentiary complaints about documentary exhibits admitted over her objections at the damages trial. The exhibits are supporting documents to a damage report prepared by Martin's accounting expert, Jake Costin. Whether or not to admit evidence at trial is a preliminary question to be decided by the trial court. TEX. R. EVID. 104(a).

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Fleming v. Wilson*, 610 S.W.3d 18, 21 (Tex. 2020) (citing *In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005)). We must uphold the trial court's evidentiary ruling if there is any legitimate basis for the ruling. *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998). An appellate court should not reverse a trial court for an erroneous evidentiary ruling unless the error probably caused the rendition of an improper judgment. TEX. R. APP. P. 44.1; *Malone*, 972 S.W.2d at 43; *Nat'l Freight, Inc. v. Snyder*, 191 S.W.3d 416, 421 (Tex. App.— Eastland 2006, no pet.); *see Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex. 1989). When erroneously admitted evidence is merely cumulative, any error in its admission is harmless. *Gee*, 765 S.W.2d at 396; *Snyder*, 191 S.W.3d at 423.

We note at the outset that Exhibit No. 1 is Costin's damage report. Costin testified that Exhibit Nos. 2 through 23 are documents that supported his damage report. Jurgens objected to the admission of Exhibit No. 1. On appeal, however, Jurgens does not challenge the trial court's admission of Exhibit No. 1. Exhibit No. 2 is a spreadsheet detailing several bank accounts. Costin agreed that it "[sets] forth various transactions in question which form the basis of the claims in the lawsuit." Jurgens did not object to the admission of Exhibit No. 2. Exhibit Nos. 3 through 23 contain information that supports the various entries on Exhibit Nos. 1 and 2. Jurgens directs her evidentiary complaints at the admission of thirteen of the documents constituting Exhibit Nos. 3 through 23. Martin contends that the admission of these supporting documents could not constitute reversible error because they were cumulative of properly admitted evidence and did not cause the rendition of an improper judgment. *See Snyder*, 191 S.W.3d at 421. We agree.

Jurgens first asserts that the trial court erred by overruling her objection to five exhibits on the basis that they were not sufficiently authenticated. Rule 901(a) of the Texas Rules of Evidence defines authentication as a "condition precedent" to the admissibility of evidence that requires the proponent to make a threshold showing that would be "sufficient to support a finding that the matter in question is what its proponent claims." *Elness Swenson Graham Architects, Inc. v. RLJ II-C Austin Air, LP*, 520 S.W.3d 145, 158 (Tex. App.—Austin 2017, pet. denied); *see* TEX. R. EVID. 901(a). To satisfy authenticity requirements, the proponent must "produce evidence" sufficient to support a finding that the item is what the proponent claims it to be. TEX. R. EVID. 901(a).

Exhibit No. 9 consisted of photocopies of account statements for a Wells Fargo account. Costin testified that the exhibit consisted of a collection of statements from Wells Fargo accounts. The trial court overruled Jurgens's authentication objection to the exhibit. In light of Costin's description of the exhibit,

coupled with what its contents revealed, the trial court did not abuse its discretion by determining that the exhibits were what Martin asserted they were. *See id.* 901(a), (b)(1), (b)(4). Moreover, a summary of the same information was admitted without objection in Exhibit No. 2.

Exhibit Nos. 16, 18, and 19 consisted of liens and releases to which Jurgens objected on the basis that they were not sufficiently authenticated. Exhibit No. 16 is a "Montana Trust Indenture" that was acknowledged before a notary and was therefore self-authenticating. *See* TEX. R. EVID. 902(8). Additionally, Jurgens testified that she granted a lien on her property in Montana as described in Exhibit No. 16. *See id.* 901(b)(1), (b)(4). Exhibit No. 18 is a copy of partial satisfaction of judgment executed by Jurgens that bears a "filed" mark from a Montana district court. Jurgens testified she paid the sum set out in this exhibit. *See id.* Exhibit No. 19 is a satisfaction of judgment from Montana. It is a certified copy of a public record and is therefore self-authenticating. *See id.* 902(4). Additionally, Jurgens testified that she "[made] that payment as well" with respect to Exhibit No. 19. *See id.* 901(b)(1), (b)(4).

Exhibit No. 20 is a copy of a HUD settlement statement pertaining to the sale of Billy and Alice's house. Martin questioned Jurgens about this sale prior to Jurgens's authenticity objection to the settlement statement. Additionally, several of the entries on Exhibit No. 20 were also included in Costin's damage summary that had previously been admitted. Costin testified that this information was supplied to him by Martin's previous attorney. Based on these references, the trial court did not abuse its discretion by overruling Jurgens's authenticity objection to Exhibit No. 20.

Jurgens next asserts that the trial court erred by overruling her hearsay objections to twelve documents—Exhibit Nos. 4, 5, 6, 7, 9, 12, 13, 14, 16, 19, 20, and 23. Hearsay is a statement, other than one made by the declarant while testifying

at trial, that is offered to prove the truth of the matter asserted. TEX. R. EVID. 801(d); *Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 235 (Tex. 2007). Hearsay is inadmissible except as provided by statute, the Rules of Evidence, or rules prescribed under statutory authority. TEX. R. EVID. 802; *McShane*, 239 S.W.3d at 235 (noting that out-of-court statements are normally excluded as hearsay). We note at the outset that Jurgens did not object to Exhibit Nos. 12 and 14 on the basis that they constituted hearsay. Accordingly, Jurgens has not preserved a hearsay complaint about these exhibits for appellate review. *See* TEX. R. APP. P. 33.1.

Exhibit Nos. 4, 5, 6, 7, and 9 are bank statements and related documents. Exhibit No. 13 consists of copies of checks written by Jurgens. And as we previously noted, Exhibit No. 16 is the Montana equivalent of a deed of trust; Exhibit No. 19 is a release of judgment; and Exhibit No. 20 is a HUD settlement statement. "[I]n many instances, experts may rely on inadmissible hearsay, privileged communications, and other information that the ordinary witness may not." *In re Christus Spohn Hosp. Kleberg*, 222 S.W.3d 434, 440 (Tex. 2007) (citing TEX. R. EVID. 703). Thus, an expert can rely upon hearsay to form an opinion if such evidence reasonably would be relied upon by experts in the field in forming opinions or inferences regarding the subject at issue. *See In re Marriage of Bivins*, 393 S.W.3d 893, 901 (Tex. App.—Waco 2012, pet. denied). Given the financial nature of Exhibit Nos. 4, 5, 6, 7, 9, 13, 16, 19, and 20, the trial court could have reasonably concluded that an expert in Costin's field of accounting and finance would reasonably rely on documents of this type to perform an accounting of the estates.

Exhibit No. 23 is a one-page document verifying automobile insurance information for two vehicles that were previously owned by Billy and Alice. Other than indicating the vehicles were once owned by Billy and Alice, Exhibit No. 23 has no significance to the final judgment. Furthermore, Jurgens admitted that the

vehicles were owned by her parents. Accordingly, the trial court did not reversibly err by admitting Exhibit No. 23.

Finally, Jurgens asserts that the trial court erred by overruling her relevancy objections to Exhibit Nos. 4, 12, 13, 16, and 18.

To be admissible, evidence must be relevant. TEX. R. EVID. 402. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." TEX. R. EVID. 401. The relevance test is satisfied if there is some logical connection, either directly or by inference, between the fact offered and the fact to be proved. *Reliant Energy Servs., Inc. v. Cotton Valley Compression, L.L.C.*, 336 S.W.3d 764, 793 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

Exhibit No. 4 shows Billy's designation of Jurgens as primary beneficiary on his Roth IRA account upon his death, as well as the balances on that account. Exhibit Nos. 12 and 13 are copies of checks written by Jurgens. Exhibit No. 16 is the Montana deed of trust and Exhibit No. 18 is a partial satisfaction of a Montana judgment. The trial court did not abuse its discretion by overruling Jurgens's relevancy objections to these exhibits because they were relevant to the damages that Martin claimed. Moreover, the relevant information from these documents was cumulative of the information in Costin's damage report and his supporting spreadsheet (Exhibit Nos. 1 and 2). *See Snyder*, 191 S.W.3d at 421. We overrule Jurgens's ninth issue.

*Constructive Trust*

In her seventh issue, Jurgens contends that the trial court had no authority to impose a constructive trust in favor of Martin over all of Jurgens's property. She also asserts that the trial court erred by imposing a constructive trust over unidentified assets. Jurgens contends that she preserved these complaints for appellate review by objecting to the "form, content, and result" of the trial

37

court's final judgment. In this regard, Jurgens filed objections to Martin's proposed final judgment that provided: "Jurgens disagrees with the form of the proposed judgment, disagrees with the content and result of the proposed judgment, and plans to challenge the proposed judgment. *See First Nat'l Bank v. Fojtik*, 775 S.W.2d 632, 633 (Tex. 1989)."

Assuming an objection to a proposed judgment was sufficient to preserve a complaint about a judgment, Jurgens's reliance on *Fojtik* to preserve error was misplaced. The language approved for use in *Fojtik* was intended for use in a motion for judgment filed by a party that desires to later attack the judgment on appeal. 775 S.W.2d at 633. A party would waive his appeal if he filed a motion for judgment without the safe harbor language approved in *Fojtik*. *Id.*

To preserve a complaint for appellate review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling, if they are not apparent from the context of the request, objection, or motion. TEX. R. APP. P. 33.1(a); *see Holden v. Holden*, 456 S.W.3d 642, 648 (Tex. App.—Tyler 2015, no pet.); *Solomon v. Steitler*, 312 S.W.3d 46, 60 (Tex. App.—Texarkana 2010, no pet.). To preserve a complaint related to an error in a judgment, a party must inform the trial court of its objection by a motion to amend or correct the judgment, a motion for new trial, or some other similar method. *Holden*, 456 S.W.3d at 648; *Solomon*, 312 S.W.3d at 60; *Homes v. Humphrey*, 244 S.W.3d 570, 582 (Tex. App.—Beaumont 2008, pet. denied); *Dal–Chrome Co. v. Brenntag Sw., Inc.*, 183 S.W.3d 133, 144 (Tex. App.—Dallas 2006, no pet.). Thus, Jurgens's general statement that she "disagrees" with the judgment was insufficient to preserve any complaints for appellate review.

Jurgens never presented a complaint to the trial court that it was without authority to grant a constructive trust over all of her property or that it erred by imposing a constructive trust over unidentified assets. The Texarkana Court of

Appeals addressed a similar situation in *Solomon*. 312 S.W.3d at 60. In *Solomon*, the appellant presented an appellate issue challenging the trial court's issuance of a permanent injunction on the basis that it violated the one-satisfaction rule. *Id.* However, the appellant did not present this legal question to the trial court for consideration. *Id.* at 60–61. The Texarkana Court of Appeals concluded that the appellant waived the issue for appellate review by not presenting the complaint to the trial court. *Id.* at 61.

We agree with the holding in *Solomon*. In order for Jurgens to preserve her legal complaints about the propriety of the constructive trust imposed by the trial court in its final judgment, she was required to present them to the trial court for consideration in a motion challenging the judgment. She did not do so. Accordingly, Jurgens did not preserve her complaints about the constructive trust for appellate review. *See* TEX. R. APP. P. 33.1; *Burbage*, 447 S.W.3d at 258. We overrule Jurgens's seventh issue.

*Post-Petition Constructive Trust Over a Bankruptcy Asset*

In her eighth issue, Jurgens contends that the trial court erred by imposing a "post-petition constructive trust" over a bankruptcy asset. In her brief, Jurgens cites provisions of the Texas Property Code and Montana statutes pertaining to homestead law, and portions of the United States Code pertaining to bankruptcy. She contends that the trial court erred by imposing a post-petition constructive trust over her Montana homestead because it was subject to her bankruptcy proceeding in Montana.

As was the case with her seventh issue, Jurgens cites her general statement in her objection to the proposed judgment that she "disagrees" with the proposed judgment as the method by which she preserved error for her legal complaints presented in her eighth issue. As was the case with Issue Seven, this general statement of displeasure was insufficient to preserve for appellate review her

39

contentions that the constructive trust did not comply with various laws. Jurgens did not preserve for appellate review her legal complaints about the constructive trust because she did not present them to the trial court for consideration. *See* TEX. R. APP. P. 33.1; *Burbage*, 447 S.W.3d at 258.

Moreover, Martin cites an order in the appellate record from the bankruptcy court wherein it held Martin's adversary claim in the bankruptcy proceeding in abeyance pending the outcome of the state court proceedings. This order indicates that the bankruptcy court determined that Martin's entitlement to a constructive trust was dependent on the outcome of the state court proceedings. Thus, the bankruptcy court authorized the trial court to adjudicate Martin's claims against Jurgens.

In her eighth issue, Jurgens also challenges the sufficiency of the evidence to support a finding made by the trial court. This finding relates to Jurgens's bankruptcy proceeding. Specifically, the trial found: "[I]t would be inequitable for [Jurgens] to retain any portion of her claimed homestead exemption that resulted from her misappropriation of funds from Alice Jean Martin or the Estate and [Jurgens] would be unjustly enriched to the detriment of the heirs and beneficiaries of the Estate." Jurgens contends that no evidence was offered at the damages trial to support this finding. This finding tracked an allegation in Martin's pleadings wherein he sought a constructive trust and alleged that Jurgens had been unjustly enriched.

As we noted previously, the trial court imposed death penalty sanctions against Jurgens and entered a default judgment against her as to liability. When a default judgment is taken on an unliquidated claim, all allegations of fact set forth in the petition are deemed admitted, except the amount of damages. *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 83 (Tex. 1992); *Stoner v. Thompson*, 578 S.W.2d 679, 684 (Tex. 1979). "[I]f the facts set out in the petition allege a cause of action, a default judgment conclusively establishes the defendant's liability."

*Morgan v. Compugraphic Corp.*, 675 S.W.2d 729, 731 (Tex. 1984). Thus, in light of the default judgment, Jurgens is deemed to have admitted all of the factual allegations in Martin's pleadings establishing her default judgment liability. *See Estate of Preston*, 346 S.W.3d 165–66 (citing *Holt Atherton*, 835 S.W.2d at 83; *Morgan*, 675 S.W.2d at 731). Jurgens cannot now challenge those admissions. *See id.* We overrule Jurgens's eighth issue.

*Attorney's Fees*

In her tenth issue, Jurgens challenges the trial court's award of $341,418 in attorney's fees. She asserts that the evidence was insufficient to support the trial court's award. We agree.

We note at the outset that the trial court and the parties did not have the benefit of the Texas Supreme Court's opinion in *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469 (Tex. 2019). In *Rohrmoos Venture*, the court clarified the manner in which a lower court should determine an award of attorney's fees. 578 S.W.3d at 496. Texas uses the "lodestar method" which is essentially a "short hand version" of the *Arthur Andersen*[12] factors, to determine reasonable and necessary attorney's fees. *Id.* Under the lodestar method, the factfinder must first determine the reasonable hours spent by counsel and the reasonable hourly rate for counsel's work. *El Apple 1, Ltd. v. Olivas*, 370 S.W.3d 757, 760 (Tex. 2012). The factfinder then multiplies the number of hours that counsel worked on the case by the applicable rate to determine the base fee or lodestar. *Id.* The base fee is presumed to reflect the reasonable and necessary attorney's fees. *Rohrmoos Venture*, 578 S.W.3d at 499. The factfinder may adjust the lodestar up or down if relevant factors indicate an adjustment is necessary to reach a reasonable fee in the case. *Id.* at 500–01.

---

[12]*Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997).

41

It is the fee claimant's burden to provide sufficient evidence of both the reasonable hours worked and the reasonable hourly rate. *Id.* at 498. "Sufficient evidence includes, at a minimum, evidence of (1) particular services performed, (2) who performed the services, (3) approximately when the services were performed, (4) the reasonable amount of time required to perform the services, and (5) the reasonable hourly rate for each attorney performing the services." *Id.*

"General, conclusory testimony devoid of any real substance will not support a fee award." *Id.* at 501. Generalities about tasks performed provide insufficient information for the factfinder to meaningfully review whether the tasks and hours were reasonable and necessary. *El Apple 1*, 370 S.W.3d at 764. While contemporaneous billing records are not required, there must be some evidence to inform the trial court of the time spent on specific tasks to enable the factfinder to meaningfully review the requested fees. *Rohrmoos Venture*, 578 S.W.3d at 502; *Long v. Griffin*, 442 S.W.3d 253, 253, 255 (Tex. 2014) (per curiam); *City of Laredo v. Montano*, 414 S.W.3d 731, 736–37 (Tex. 2013) (per curiam) (reversing and remanding to redetermine attorney's fees when attorney testified to the time expended and the hourly rate but failed to provide evidence of the time devoted to specific tasks).

The evidence to support the amount of attorney's fees awarded to Martin was in the form of affidavits from five of Martin's attorneys and an affidavit from an accountant. The largest amount of attorney's fees was from Martin's former lead counsel, Robyn Frohlin, wherein she asserted attorney's fees of $337,970.93. She averred as follows:

> I have personal knowledge of the work performed on this and the Probate Action by myself and other members of my firm and have personal knowledge of the hourly rates charged. It is my opinion that all of the work performed in these matters was reasonable and necessary and that the total of all fees and costs charged were customary and

42

reasonable. The total of fees and costs incurred and billed by my firm to this matter and the Probate Action is $337,970.93. Full and complete payments have been made on all bills submitted by my firm for payment to date.

This provision is the sole basis provided by Frohlin for a recovery of her attorney's fees. The affidavits from the other attorneys were similarly devoid of specific information. The attorneys' affidavits did not discuss the particular services performed, who performed the services, the reasonable amount of time required to perform the services, or the reasonable hourly rate for each attorney performing the services—all of which are required by *Rohrmoos Venture*. *See* 578 S.W.3d at 498. There is simply no reference to the hours worked and the hourly rate charged. *See id.* Without details about the work done and how much time was spent on each task, the affidavits "lack[] the substance required to uphold a fee award." *See id.* at 505.

We sustain Jurgens's tenth issue. We reverse the trial court's award of attorney's fees to Martin in the amount of $341,418 and remand the issue to the trial court for a redetermination of attorney's fees. *See El Apple*, 370 S.W.3d at 765 (concluding that, because record did not provide sufficient evidence to support discretionary award of attorney's fees under the Texas Commission on Human Rights Act, case should be remanded to the trial court for a redetermination of fees); *see also Rohrmoos Venture*, 578 S.W.3d at 505; *Long*, 442 S.W.3d at 256.

*Fraud*

Jurgens's eleventh and twelfth issues concern the trial court's determination that she committed fraud. In Issue Eleven, she contends that the trial court erred by overruling her objection to the inclusion of the fraud finding. In this regard, Jurgens specifically challenged the fraud finding in her objections to Martin's proposed judgment. In Issue Twelve, Jurgens asserts that the trial court erred in denying her "Motion for New Trial and/or Modification of Amended Final Judgment" wherein she challenged the fraud finding. Jurgens based both requests on the same

43

argument—that the trial court issued a prejudgment letter on July 23, 2018, wherein the court stated, "The court does not make a finding regarding fraud."

We first note that, prior to the issuance of the July 23, 2018 letter, the trial court made an affirmative determination that Jurgens committed fraud. The trial court made this previous finding in its June 2017 order granting death penalty sanctions and default judgment on liability. And then, as previously noted, after the July 23, 2018 prejudgment letter, the trial court issued a final judgment that included an affirmative fraud finding. The trial court also included an affirmative fraud finding in its findings of fact and conclusions of law.

We disagree with Jurgens's contention that the trial court was bound by the terms of the prejudgment letter. A letter ruling of this type is not "competent evidence of the trial court's basis for judgment." *Cherokee Water Co. v. Gregg Cty. Appraisal Dist*., 801 S.W.2d 872, 878 (Tex. 1990); *see Bell Helicopter Textron, Inc. v. Burnett*, 552 S.W.3d 901, 912 (Tex. App.—Fort Worth 2018, pet. denied). In this instance, the trial court may have a reached the opposite conclusion when it later signed the final judgment. *See Cherokee Water*, 801 S.W.3d at 878. Furthermore, a letter of this type is not a finding of fact as contemplated by the rules of civil procedure. *See id.* Explanatory letters from the trial court preceding a judgment do not impact the standard or scope of our appellate review. *See Tex. Bd. of Chiropractic Exam'rs v. Tex. Med. Ass'n*, 375 S.W.3d 464, 482 n.24 (Tex. App.—Austin 2012, pet. denied).

Moreover, because of the default judgment, Jurgens is deemed to have admitted Martin's fraud allegations. *See Holt Atherton*, 835 S.W.2d at 83; *Morgan*, 675 S.W.2d at 731; *Estate of Preston*, 346 S.W.3d 165–66. Accordingly, Jurgens is precluded from challenging the sufficiency of the evidence supporting the fraud finding. We overrule Jurgens's eleventh and twelfth issues.

*Compensatory Damages Awarded to Martin*

In Issues Thirteen[13] and Fourteen,[14] Jurgens asserts that the trial court erred by awarding Martin a "windfall in compensatory damages." She bases her contention on the argument that Martin received a windfall because the $353,000 exceeded the amount that he was entitled to receive from Alice's estate. Jurgens asserts that, at most, Martin would only be entitled to a one-third share of Alice's estate based on the fact that Alice was survived by three children. *See* EST. § 201.001. She contends that the recovery against her in favor of Martin should have been rendered in favor of Alice's estate so that the money could be properly disbursed after Martin's will contest is resolved. We agree.

As we have previously noted, Martin cast his suit against Jurgens as an effort to restore the property of Alice's estate. Thus, while Jurgens's actions derivatively affected the share that Martin would receive from Alice's estate, the harm was suffered by Alice's estate, and the recovery against Jurgens should have been in favor of Alice's estate. *See Holden*, 456 S.W.3d at 655–57 (agent operating under power of attorney granted by decedent ordered to pay wrongfully taken funds to decedent's estate). Accordingly, we sustain Jurgens's thirteenth and fourteenth issues. The portion of the judgment awarding $353,000 in favor of Martin is reversed, and we remand this matter to the trial court with instructions to render judgment in favor of Alice's estate, or Billy's estate, as the trial court may determine. The trial court shall impose any condition that the trial court determines is necessary for the preservation of the funds that are to be paid by Jurgens as damages to the estates (of which she is still the executor).

---

[13]Issue Thirteen concerns the trial court's implicit denial of Jurgens's objections to Martin's proposed final judgment wherein she asserted that any recovery should be in favor of the estates of Alice and Billy.

[14]Issue Fourteen concerns the trial court's implicit denial of Jurgens's "Motion for New Trial and/or Modification of Amended Final Judgment."

*New Trial*

Issue Fifteen concerns Jurgens's second motion for new trial. She contends that the trial court erred in failing to hold a hearing on the motion and that the trial court erred by not granting the motion for new trial in its entirety. With respect to the hearing on the second motion for new trial, the record does not reflect that Jurgens requested a hearing on the motion. She contends in her brief that she requested a hearing on the motion, but the page that she directs us to in the clerk's record is her request for a hearing on her first motion for new trial. Generally, the decision to hold an evidentiary hearing on a motion for new trial in a civil case is within the trial court's discretion. *Hamilton v. Pechacek*, 319 S.W.3d 801, 807 (Tex. App.—Fort Worth 2010, no pet.); *Landis v. Landis*, 307 S.W.3d 393, 394 (Tex. App.—San Antonio 2009, no pet.). A trial court is required to conduct a hearing only after it is requested by a party and when the motion for new trial presents a question of fact upon which evidence must be heard. *Hensley v. Salinas*, 583 S.W.2d 617, 618 (Tex. 1979) (per curiam). In the absence of a request for a hearing on Jurgens's motion for new trial, the trial court did not err in not holding a hearing on the motion.

With respect to the merits of her second motion for new trial, Jurgens summarily argues as follows in her brief:

> Jurgens refers this Court to her arguments presented under Issue Nos. 3-6 and Issue Nos. 10-14 in support of her argument that the trial court erred in refusing to grant her a new trial. To avoid a needless repetition of facts and law, Jurgens incorporates herein her arguments under Issue Nos. 3-6 and Issue Nos. 10-14 for all purposes as if quoted verbatim.

We need not consider these issues again in light of our previous disposition of Issues Three, Four, Five, Six, Ten, Eleven, Twelve, Thirteen, and Fourteen. We overrule Jurgens's fifteenth issue.

*This Court's Ruling*

We reverse the judgment of the trial court as to Martin's claim for fraud on the community in the amount of $79,978.38, and we render judgment that Alice's estate takes nothing on that claim. We also reverse the trial court's judgment insofar as it awarded attorney's fees to Martin in the amount of $341,418, and we remand the issue to the trial court for a redetermination of attorney's fees. Additionally, we reverse the trial court's judgment insofar as it awarded the recovery of $353,000 in favor of Martin, and we remand the issue of compensatory damages to the trial court with instructions to render judgment in favor of Alice's estate, or Billy's estate, as the trial court may determine. The trial court shall impose any condition that the trial court determines is necessary for the preservation of the funds that are to be paid by Jurgens as damages to the estates (of which she is still the executor). We affirm the trial court's judgment in all other respects.


JOHN M. BAILEY
CHIEF JUSTICE


March 18, 2021

Panel consists of: Bailey, C.J.,
and Wright, S.C.J.[15]

Trotter, J., and Williams, J., not participating.

---

[15]Jim R. Wright, Senior Chief Justice (Retired), Court of Appeals, 11th District of Texas at Eastland, sitting by assignment.